**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| NORTHERN ASSURANCE CO. OF AMERICA, *et al.*, Plaintiffs/Counterclaim-Defendants, ) ) ) ) | |
| v. | CIVIL ACTION NO. 11-00283-KD-N |
| C & G BOAT WORKS, INC., Defendant/Counterclaim-Plaintiff. ) ) ) | |

**ORDER**

This matter is before the Court on Plaintiffs' Motion for Summary Judgment (Doc. 27), Defendant's Motion for Summary Judgment (Doc. 28), and Plaintiffs' three Motions To Strike (Docs. 31, 32, & 39). Upon consideration of the parties' briefs and evidentiary submissions (Docs. 27-1 to 27-8, 28-1 to 28-11, 30, 33, 33-1 to 33-4, 35, 35-1, 36, 37, 37-1, 38, 38-1 to 38-2, & 40), Defendant's motion (Doc. 28) is due to be **GRANTED**, and each of Plaintiffs' motions (Docs. 27, 31, 32, & 39) is due to be **DENIED**.

**I.      Procedural History**

On June 2, 2011, Plaintiffs/Counterclaim-Defendants Northern Assurance Company of America, National Union Fire Insurance Company of Pittsburgh, PA, Indemnity Insurance Company of North America, Great American Insurance Company, AGCS Marine Insurance Company, Essex Insurance Company, Catlin Insurance Company, Zurich American Insurance Company, and Travelers Insurance Company (collectively, "Plaintiffs" or "Underwriters") commenced this action by filing a complaint against Defendant C & G Boat Works, Inc. ("C&G") seeking a declaration that, under an insurance policy between the Underwriters and C&G, coverage does not exist for certain damage to the engines of Hull 117, a tug boat that C&G built in 2010. (Doc. 1). C&G answered the complaint on June 30, 2011, and

counterclaimed that it was entitled to coverage under the policy. (Doc. 8). On March 9, 2012, after the close of discovery, Underwriters and C&G cross-moved for summary judgment. (Docs. 27 & 28). The parties' responses (Docs. 30 & 33) and replies (Docs. 37 & 38) were all timely filed, and the motions are now ripe for consideration.

## II.    Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56(c) governs procedures and provides as follows:

> **(1)** *Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
>> (A)   citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>>
>> (B)   showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> **(2)** *Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> **(3)** *Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.
>
> **(4)** *Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c).

A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)). The mere existence of a factual dispute will not automatically necessitate denial; rather, only factual disputes that are material preclude entry of summary judgment. <u>Lofton v. Sec'y of Dep't of Children & Family Servs.</u>, 358 F.3d 804, 809 (11th Cir. 2004).

If the movant satisfies its initial burden under Rule 56(c), the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." <u>See</u> <u>Clark</u>, 929 F.2d at 608. In reviewing whether the non-moving party has met its burden, the Court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in its favor. <u>Tipton v. Bergrohr GMBH-Siegen</u>, 965 F.2d 994, 998-99 (11th Cir. 1992) (internal citations and quotations omitted).

The applicable Rule 56 standard is not affected by the filing of cross-motions for summary judgment. <u>See, e.g.</u>, Am. Bankers Ins. Group v. United States, 408 F.3d 1328, 1331 (11th Cir. 2005); <u>Gerling Global Reins. Corp. of Am. v. Gallagher</u>, 267 F.3d 1228, 1233 (11th Cir. 2001). "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." <u>United States v. Oakley</u>, 744 F.2d 1553, 1555 (11th Cir. 1984) (citation omitted). The Court is mindful that "'[w]hen both parties move for summary judgment, the court must evaluate each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration.'" <u>Muzzy Prods., Corp. v. Sullivan Indus., Inc.</u>, 194 F. Supp. 2d 1360, 1378 (N.D. Ga. 2002) (quoting <u>Gart v. Logitech,</u>

Inc., 254 F.3d 1334, 1338-39 (Fed. Cir. 2001)).  The Court has reviewed the facts submitted by each party and has made its own examination of the evidentiary record.

### III.    Factual Background[1]

On July 11, 2008, Crescent Towing & Savage Company, Inc. ("Crescent Towing") contracted with C&G, a boatbuilder in Mobile, Alabama, to construct a 92-foot tug boat identified by the contract as Hull 117.  (Doc. 27-2).  That same day, Crescent Towing separately contracted with C&G to build two additional tug boats, Hull 116 and Hull 118.  (Doc. 27-1 at 2, ¶ 1; Doc. 33-1 at 1-2, ¶ 1).

On or about March 3, 2010, Underwriters issued a hull builder's risk policy, Policy No. MNB 1944-2010 (the "Policy"), to C&G.  (Doc. 1-7).   Subject to certain conditions, limitations, and exclusions, the Policy required Underwriters to pay up to $10,000,000 for any one accident or occurrence causing loss or damage to any of a dozen vessels — including Hulls 116, 117, and 118 — that were listed on a schedule incorporated into the Policy.  (Id. at 3, 7, & 29).  The Policy insured against "all risks of physical loss of or damage to the Vessel during the currency of [the] Policy," which ran from March 7, 2010 to March 7, 2011.  (Id. at 6-7).  The term "Vessel" was defined as "the hull, launches, lifeboats, rafts, furniture, bunkers, stores, tackle, fittings, equipment, apparatus, machinery, boilers, refrigeration machinery, insulation, motor generators, and other electrical machinery, ordnance, munitions, and appurtenances, including materials, plans, patterns and moulds, staging, scaffolding and similar temporary construction." (Id. at 6).

---

[1]    The Court's recitation of facts relies heavily on the affidavits and testimony of C&G personnel.  With respect to those affidavits, Underwriters have either not disputed the facts relied upon herein or not come forward with conflicting evidence.  Instead, in a series of motions to strike, Underwriters have challenged the admissibility of affidavits themselves.  Underwriters' motions are addressed — and denied — in Section IV.A, *infra*.

Pursuant to its contract with Crescent Towing, C&G installed two GE 6L250 diesel engines — one for the port side and one for the starboard side — in Hull 117.  (Doc. 27-1 at 2, ¶ 2; Doc. 33-1 at 2, ¶ 2).  Because prepackaged piping systems were not available from the engines' manufacturer, C&G fabricated an external lube oil piping system for each engine, the purpose of which was to filter, recirculate, and monitor the temperature and pressure of oil that had gone through the engine's internal combustion process.  (Doc. 27-1 at 2, ¶ 3; Doc. 27-3 at 6; Doc. 33-1 at 2, ¶ 3).

C&G's general manager, William Michael Cook ("Cook"), discussed with C&G's yard superintendent, William Elmore ("Elmore"), the materials, welding techniques, and cleaning procedures that C&G's employees were to use with respect to cutting, fitting, welding, flushing, and cleaning the pipe used to make the oil piping systems.  (Doc. 33-3 at 4, ¶ X; Doc. 33-4 at 4, ¶ XIII).  Elmore relayed Cook's instructions to Kenneth Sprouse ("Sprouse"), a pipe foreman who had supervisory authority over the pipefitters and welders who worked on Hull 117.  (Doc. 33-4 at 5, ¶ XVI; Doc. 8-2 at 3, ¶ VIII).  With respect to the welding and flushing of the lube oil piping systems, the pipefitters and welders were not given written instructions.  (Doc. 27-3 at 4).  However, the pipefitters and welders were told orally and made aware repeatedly that Hull 117's lube oil piping systems were to be made of "pickled pipe," that cuts made in the pipe were to be deburred and cleaned, internally and externally, prior to fit up, and that "root passes" (initial weld passes, as opposed to secondary "filler passes" and final "cap passes") were to be made using tungsten inert gas ("TIG") rather than stick welding techniques.  (Doc. 8-2 at 10, ¶ VII; id. at 11-12, ¶¶ XII-XIII; id. at 17, ¶ VIII; id. at 18-19, ¶¶ XII-XIII; id. at 23-24, ¶ VIII; id. at 25-26, ¶¶ XII-XIII).[2]

_____

[2]   At an April 9, 2012 hearing before the undersigned, Cook explained that "pickled pipe" is

Following assembly, C&G flushed the oil piping systems.   (Doc. 28-4 at 3, ¶ VI). Flushing was accomplished by using a 180 gallon-per-minute pump to circulate hot oil through the pipe.  (Doc. 27-3 at 20-21; Doc. 27-6 at 3).  C&G circulated the oil in one direction for four days and then reversed the flow.  (Doc. 27-6 at 3).  The employees overseeing the flushing stopped periodically to inspect and clean a cloth sock filter that collected particulates.  (Id.). When C&G could no longer visually detect the presence of any contaminants, it sent an oil sample to an outside laboratory for a particle count.  (Id.).

On or about September 30, 2011, C&G conducted sea trials of Hull 117.  During those sea trials, the port main engine experienced high bearing temperatures.  (Doc. 27-1 at 2, ¶ 4; Doc. 33-1 at 2, ¶ 4).  Both the port and starboard engines were subsequently inspected by a marine surveyor who discovered signs of damage.  (Doc. 28-5 at 1-2).  Bore-scoping of the lube oil systems revealed significant amounts of various metal particles present in random areas within the piping.  (Id. at 2).  The surveyor attributed said contamination to "torch cutting, arc welding and mechanical grinding that C&G personnel carried out while fabricating [the] piping systems, and which C&G's subsequent attempts at cleaning and flushing the systems prior to the engines

---

pipe through which an acidic substance has been circulated to remove rust, mill scale, and other particulates.  See also Doc. 33-3 at 3, ¶ VI; Doc. 33-4 at 3, ¶ VIII; Doc. 37-1 at 2-3.  A piping system can be constructed of pre-pickled pipe or of unpickled pipe that is pickled after fitting and weld up.  (Doc. 33-3 at 3, ¶ VII).

Deburring is the process of grinding and smoothing rough metal edges that result from cold cutting and drilling pipe.  (Doc. 35-1 at 2).  Pipe can also be cut and penetrated using a procedure known as "torch cutting," which, according to Cook, does not require subsequent deburring. (Doc. 33-3 at 1-2, ¶ II; Apr. 9, 2012 hearing testimony).  However, torch cutting can deposit molten metal referred to as "burn slag" or "burning slag" into the pipe's internals.  (Doc. 8-2 at 6, ¶ XVI; id. at 13-14, ¶ XVI; id. at 20-21, ¶ XVI; id. at 27, ¶ XVI; Doc. 27-3 at 12).

TIG welding differs from stick welding, insofar as a self-sacrificing, flux-coated electrode is used to create a stick weld, whereas a non-consumable tungsten electrode and separate filler rod are used to create a TIG weld.  (Doc. 28-3 at 3-4).  Relative to stick welding, TIG welding produces far less — or no — weld spatter.  (Id. at 3; Doc. 27-1 at 5 n.1).

6

being commissioned, failed to effectively remove." (Id. at 4).  According to a memorandum that Cook wrote to memorialize the construction of Hulls 116 and 117 and the failure of Hull 117's sea trials (Doc. 27-6), the bore-scope showed significant amounts of slag in two particular points of each piping system: 1) at a coupling between the lube oil filter and the entrance to the engine (burn slag and weld slag) and 2) at a 90-degree elbow further down the pipe (weld slag only).[3]

Crescent Towing retained a metallurgical engineering consultant to determine the cause, nature, and extent of engine damage to Hull 117's engines.  The consultant found that the engines' main bearings were badly scored, and he concluded that the damage to the bearings was caused by the presence of a variety of contaminants — namely aluminum oxide, steel shavings,

---

[3]  Cook's memo does not indicate clearly which parts of the piping systems were improperly stick welded and torch cut.  The memo also does not indicate clearly which parts — if any — were welded in accordance with Cook's express instruction to TIG weld and cut in accordance with his implied instruction to cold cut.  However, at the April 9 hearing, Cook clarified that 1) *both* the port and starboard lube oil piping systems showed concentrations of burn slag at one coupling near the entrance to each engine and 2) stick weld slag was detected near a single 90-degree elbow on *each* system.  Cook also testified that each piping system required approximately 20 root passes, which means that, with respect to both systems, all but two of approximately 40 root passes were accomplished with TIG welding rather than stick welding.

Though Cook's memorandum states that Sprouse, C&G's pipe foreman, "confessed" to having improperly used a burning torch and stick rod on Hull 117 (Doc. 27-6 at 3), Sprouse, in his affidavit, disclaimed any knowledge of how slag got into the piping systems.  See Doc. 8-2 at 3-6, ¶¶ VIII, XV, & XVIII (discussing remedial actions that Sprouse purportedly would have taken had the improper welding and utilization of a burning torch "been made known to [him]").  Additionally, none of the pipefitters and welders whose affidavits are before the Court professed to know who was responsible for introducing destructive slag into the lube oil piping systems.  See id. at 8-27.  At the April 9 hearing, Cook clarified that Sprouse admitted only to having failed to supervise his crew; the identity of the employee or employees who deviated from C&G's instructions remains unknown.  See also Doc. 38-1 at 75.  This clarification comports with yard superintendent Elmore's affidavit, which states that Sprouse reported the faulty work without accepting responsibility for the same.  See Doc. 33-4 at 7, ¶ XXI ("Sprouse reported[] a 90 degree elbow was installed in the [starboard] lube oil piping system . . . and a 90 degree elbow was installed in the [port] lube oil piping system . . . of Hull No. 117; that the welding root pass for each of those elbows were believed to have been welded up using a stick rod, rather than TIG."); id. ¶ XXII ("Declarant recalls in the same conversation[] also learning from Kenneth Sprouse that a coupling had been installed using a burning torch to penetrate the four inch pipe . . . .").

weld spatter, and, to a lesser extent, sand — in the oil piping systems that C&G constructed. (Doc. 28-6 at 1 & 2).  Over the course of several weeks in October and November 2010, Hull 117's engines were extracted and then replaced with engines previously intended for use in Hull 118.  (Doc. 27-3 at 19; Doc. 28-5 at 2-3).  Additionally, Hull 117's lube oil piping systems were cut out of the boat and transported in pieces to a facility operated by Tube-Mac Industries ("Tube-Mac") where they were re-pickled and flushed.  (Doc. 27-3 at 16-19; Doc. 27-6 at 2-3; Doc. 33-4 at 9, ¶ XXVII).[4]

C&G submitted a written notice of loss to the Underwriters on October 5, 2010.  (Doc. 27-1 at 4, ¶ 9; Doc. 28-1 at 7).  On December 7, 2010, Senior Marine Claims Representative Carlos Marshall ("Marshall") advised C&G that its loss was excluded by the Policy:

> The Northern Assurance Company of America respectfully advises C&G Boat Works, Inc., Graham Gulf, Inc., and Davenport Properties, LLC that the Policy excludes coverage for any loss, damage or expense caused or arising in consequence of faulty production or assembly procedures even if constituting faulty design.  The faulty production or assembly procedures consist of metal contamination of the lube oil piping systems which resulted from torch cutting, arc welding and mechanical grinding that C&G personnel carried out while fabricating those piping systems, and C&G's subsequent attempts at cleaning and flushing the systems prior to the engines being commissioned.  Loss, damage or expense for the engines caused or arising in consequence of the foregoing is excluded.

---

[4]   C&G hired Tube-Mac to re-pickle and flush Hull 117's lube oil piping systems only after it discovered that those systems had been contaminated by slag and weld flux.  (Doc. 33-3 at 8, ¶ XIX).  In contrast, from the outset, C&G protocol for Hull 116's lube oil piping systems — which were made of black iron pipe (as opposed to pre-pickled pipe) and joined with stick welds (as opposed to TIG root passes) — called for Tube-Mac to pickle the systems in place (*i.e.*, in the boat) following completion of all fitting and welding.  (Id.).  Though Hull 118's lube oil piping systems "mirrored" Hull 117's, inasmuch as both used pre-pickled pipe as part of a procedure that prohibited stick welding root passes and torch cutting, Tube-Mac re-pickled and flushed Hull 118's systems after C&G learned that Hull 117's systems had been welded and cut using proscribed techniques.  (Id. at 9, ¶ XX; Apr. 9, 2012 hearing testimony).  C&G believed that using a subcontractor like Tube-Mac to re-pickle pre-picked pipe would be unnecessary if TIG welding and cold cutting techniques were employed.  (Doc. 33-3 at 8, ¶ XIX).

(Doc. 28-7 at 2).  Marshall then referred to Addendum No. 2 of the Policy, which, in pertinent

part, replaced certain provisions of the Policy with the following:

1.  It is hereby understood and agreed that lines 61 and 62 of the "PART I -- HULL
    SECTION, HULL RISKS" are deleted and the following substituted therefore:

    Subject to the provisions of exclusion (b) of the following paragraph, in the
    event that faulty design of any part of parts should cause physical loss of or
    damage to the Vessel this insurance shall not cover the cost or expense of
    repairing, replacing or renewing such part of parts, nor any expenditure
    incurred by reason of a betterment or alteration in the design.  Faulty design
    shall include, but not be limited to, error, omissions or deficiencies in plans,
    drawings, specifications or calculations.

    Further, Underwriters shall not pay for any loss, damage or expense caused or
    arising in consequence of:

    a)  Faulty workmanship, or the installation or use of improper or defective materials,
        unless resulting in destruction, deformation, breaking, tearing, bursting, holing or
        cracking of the Vessel, or any other like conditions, and which loss, damage or
        expense is not otherwise excluded under the terms and conditions of the war,
        strikes and other exclusions clause of the attached policy; provided that
        Underwriters in no event shall respond for the cost or expense of repairing,
        replacing or renewing any improper or defective materials;

    b)  Faulty production or assembly procedures even if constituting faulty design.

(Doc. 27-7 at 2).

C&G's attorney responded to Underwriters' declination of coverage on January 27, 2011.

(Doc. 28-9).  The attorney argued that Paragraph 1.b's exclusion for faulty production or

assembly procedures (the "faulty procedures exclusion") did not apply because C&G's

procedures were adequate; rather the engine damage at issue was caused by the faulty

workmanship of C&G's personnel, specifically with respect to the lube oil piping systems and

the installation of a coupling near the entrance to the engine and a weld further down the pipe.

(Id. at 4).  In a February 10, 2011 email to C&G's attorney, Marshall reiterated Underwriters'

reliance on the faulty procedures exclusion.  (Doc. 28-10).  As noted above, Underwriters

commenced this declaratory judgment action approximately four months later.  (Doc. 1).

IV.     **Analysis**

Before turning to its summary judgment analysis, the Court will first address Underwriters' motions to strike certain evidence that C&G submitted with its moving and responsive briefs.

A.      Underwriters' Motions To Strike (Docs. 31, 32, & 39)

In a series of three motions, Underwriters move the Court to strike Cook's March 7, 2012 declaration (Doc. 28-4), Sprouse's declaration and the declarations of three C&G pipefitters and welders (Doc. 8-2), Cook's March 29, 2012 declaration (Doc. 33-3), and Elmore's March 28, 2012 declaration (Doc. 33-4). None of the motions is well taken.

As a preliminary matter, motions to strike are generally disfavored as time wasters that distract the Court from the merits of a party's claim. See, e.g., Haynes v. Twin Cedars Youth & Fam. Servs., Inc., No. 5:10-CV-321 (CAR), 2012 WL 895699, at *5 (M.D. Ga. Mar. 15, 2012). Collectively, Underwriters and C&G have devoted nearly 45 pages to debating Underwriters' contention that the declarations should be stricken. And unnecessarily so. To the extent that Underwriters thought C&G's declarations warranted a challenge, a footnote or two would have sufficed.

Additionally, Underwriters fail to appreciate that, in the aftermath of the substantive 2010 amendments to Rule 56, it appears that motions to strike summary judgment exhibits are no longer appropriate. As revised, Rule 56 provides that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The Advisory Committee's note specifies further that such an objection "functions much as an objection at trial, adjusted for the pretrial setting" and that "[t]here is no need to make a separate motion to strike." Id. advisory committee's note

(emphasis added).[5]

In three motions challenging seven declarations, Underwriters advance two arguments: 1) certain of the declarations are "sham affidavits"; and 2) certain of the declarations are speculative and not based on personal knowledge.  The Court will address each in turn.

### 1.  Sham Affidavits

In their first and third motions, Underwriters argue that Cook's two declarations and Elmore's March 28, 2012 declaration are "sham affidavits" that contradict Cook's deposition testimony.  (Doc. 31 at 1-3; Doc. 39 at 1-3).  The challenge to Elmore's declaration is disposed of easily.  Obviously, any discrepancy between *Elmore's* declaration and *Cook's* testimony cannot trigger the sham affidavit concept, which arises when there is a clear inconsistency between factual assertions in an affidavit (or a declaration) and the affiant's own deposition testimony.  See Van T. Junkins & Assocs. v. U.S. Indus., Inc., 736 F.2d 656, 658 (11th Cir. 1984); see also Cook v. Babbitt, 819 F. Supp. 1, 21 (D.D.C. 1993) ("Resolving testimonial inconsistencies between different witnesses is far different from acknowledging, in considering the record as a whole, the effect of a prior self-contradiction . . . .").

With respect to the alleged incongruity between Cook's testimony and his subsequent declarations, the Eleventh Circuit has articulated the standard that guides this Court:

> When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create

---

[5]   The Court acknowledges that, as to the propriety of motions to strike evidence submitted in support of or in opposition to a motion for summary judgment, Alabama and federal procedures differ.  Quite recently, the Alabama Supreme Court reaffirmed its adoption of the old federal practice that a party must move to strike an affidavit that violates Rule 56 lest his objection be considered waived.  See Ex parte Secretary of Veterans Affairs, __ So. 3d __, No. 1101171, 2012 WL 415479, at *5 (Ala. Feb. 10, 2012) (citing Perry v. Mobile Cnty., 533 So. 2d 602 (Ala. 1988)).  However, as three dissenting justices recognized, the federal summary judgment rule no longer reads as it did a quarter-century ago, and it is now clear that, in federal court, "a motion to strike is not desired."  Id. at *12 n.8 (Murdock, J., dissenting).

such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.

Van T. Junkins, 736 F.2d at 657.  Accordingly, only declarations "inherently irreconcilable" with earlier testimony can be disregarded.  Tippens v. Celotex Corp., 805 F.2d 949, 954 & n.6 (11th Cir. 1986).  Not every discrepancy will justify a court's refusal to consider contradictory evidence.  See Lane v. Celotex Corp., 782 F.2d 1526, 1530 (11th Cir. 1986).

Underwriters assert that Cook's statement that "C & G's procedure required the use of cold cutting and/or drilling the pipe, not burning, to effect pipe penetration," which appears in two of his declarations, contradicts his testimony that the instructions he gave Elmore regarding the construction of Hull 117's lube oil piping systems were "exactly as [he] put in [his January 7, 2011] memo."   See Doc. 31 at 2 (comparing deposition testimony at Doc. 27-3 at 22 with averment at Doc. 28-4 at 3, ¶ V); Doc. 39 at 2 (comparing deposition testimony at Doc. 27-3 at 22 with averment at Doc. 33-4 at 5, ¶ XII).  The Court disagrees.  In his January 7 memo, Cook described C&G's "method" for Hull 117:

> The pipe purchased for the oil system was pickled pipe which comes to our facility pre-cleaned oiled and capped.  All of the fittings 90 deg elbows, flanges, etc were sandblasted to near white metal.  All cuts made in the piping were de-burred and cleaned prior to fit-up internally and externally.  All root passes (first pass) welds were made with TIG (tungsten inert gas) weld procedures to do away with weld splatter and flux inclusions commonly found with stick welding.  The open ends of the pipes covered as each piece was installed daily.

(Doc. 27-6 at 2-3).  Though Cook did not use the term "cold cutting" in his January 7 memo, he later explained that the "instruction that all cuts in the piping were to be deburred and cleaned prior to fit up internally and externally establishes clearly that the cuts are to be made by cold cutting or drilling, which instruction clearly excludes torch cutting . . . ."  (Doc. 33-3 at 2, ¶ II).  Accordingly, Cook's declarations merely made explicit facts that his memorandum implied.  This falls far short of the standard set forth in Van T. Junkins.

### 2.  *Declarations Not Based on Personal Knowledge*

Underwriters also move to strike Cook's, Elmore's Sprouse's, and three other declarations on the ground that they are not based on personal knowledge.  In support, Underwriters point to the fact that several sentences in those declarations were written in the past conditional tense, expressing what steps the declarant *would have taken had he been aware* that certain root passes were accomplished by stick welding and that certain parts of the pipe were penetrated with a torch rather than a cold drill.  (Doc. 32 at 1-4; Doc. 39 at 3-6).  Underwriters' objection is moot, and the drastic remedy of striking matter from the record is not warranted, inasmuch as the declarants' assertions as to what they would have done under circumstances other than those presented here are immaterial and play no role in the Court's summary judgment analysis.

Underwriters' Motion To Strike Affidavit of William Michael Cook, Chief Operating Officer of C & G Boat Works, Inc. (Doc. 31), Motion To Strike Affidavit of C&G Boat Works, Inc. Employees (Doc. 32); and Motion To Strike Affidavits of William Michael Cook and William Elmore (Doc. 39) are **DENIED**.

B.    Parties' Cross-Motions for Summary Judgment (Docs. 27 & 28)

### 1.  *Governing Law*

This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.  See Doc. 1 at 2-3 (setting forth that Underwriters are organized and exist under the laws of Connecticut, Delaware, Illinois, Massachusetts, New York, Pennsylvania, Ohio, and Texas; that C&G is incorporated in Alabama; and that the amount in controversy exceeds $75,000, exclusive of costs and interest).  "[A] federal court in a diversity case is required to apply the laws, including principles of conflict of laws, of the state in which the federal court sits."  Manuel v. Convergys Corp., 430

F.3d 1132, 1139 (11th Cir. 2005) (citing <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496 (1941)).  Adhering to the principle of *lex loci contractus*, Alabama courts hold that contract claims are governed by the laws of the state in which the contract was made, unless the contracting parties chose a particular state's laws to govern their agreement.  <u>Cherry, Bekaert & Holland v. Brown</u>, 582 So. 2d 502, 506 (Ala. 1991).  It is axiomatic that insurance policies are "essentially like all other contracts," <u>Hartford Fire Ins. Co. v. Shapiro</u>, 117 So. 2d 348, 352 (Ala. 1960), and are therefore subject to the *lex loci contractus* doctrine.  <u>See</u> <u>Cincinnati Ins. Co. v. Girod</u>, 570 So. 2d 595, 597 (Ala. 1990) ("Because this dispute involves an interpretation of an insurance policy issued in the State of Alabama, under Alabama's conflicts of law rule the trial court would be obligated to apply the substantive law of Alabama . . . .").  Here, the Policy was "dated" in Birmingham, Alabama (Doc. 1-7 at 6), but there is no evidence in the record as to where it was made or to where it was delivered.  Nonetheless, the Court will apply Alabama law, inasmuch as the briefs indicate the parties' shared belief that Alabama law must govern.

In Alabama, "[g]eneral rules of contract law govern an insurance contract." <u>Safeway Ins. Co. of Ala. v. Herrera</u>, 912 So. 2d 1140, 1143 (Ala. 2005).  "In the absence of statutory provisions to the contrary, insurance companies have the same right as individuals to limit their liability, and to impose whatever conditions they please upon their obligations not inconsistent with public policy; and the courts have no right to add anything to their contracts, or to take anything from them." <u>Ala. Farm Bureau Mut. Cas. Ins. Co. v. Goodman</u>, 188 So. 2d 268, 270 (Ala. 1966) (citation omitted); <u>see also</u> <u>Gregory v. W. World Ins. Co.</u>, 481 So. 2d 878, 881 (Ala. 1985) ("insurance companies are entitled to have their policy contracts enforced as written, rather than risking their terms either to judicial interpretation or the use of straining language").

However, Alabama courts have held that a "contract of insurance will be construed

strictly against the insurer and liberally in favor of the insured." <u>Tyler v. Ins. Co. of N. Am.</u>, 331 So. 2d 641, 644 (Ala. 1976) (citations omitted). "Exclusions are to be interpreted as narrowly as possible, so as to provide maximum coverage for the insured, and are to be construed most strongly against the insurance company, which drafted and issued the policy." <u>Allstate Ins. Co. v. Skelton</u>, 675 So. 2d 377, 379-80 (Ala. 1996) (citations omitted). "To the extent the language of an insurance policy provision is ambiguous, all ambiguities must be resolved against the insurance company." <u>Safeway</u>, 912 So. 2d at 1143.

"Whether a provision of an insurance policy is ambiguous is a question of law." <u>Id.</u> "The test to be applied by a court in determining whether there is ambiguity is not what the insurer intended its words to mean, but what a reasonably prudent person applying for insurance would have understood them to mean." <u>State Farm Fire & Cas. Co. v. Slade</u>, 747 So. 2d 293, 308 (Ala. 1999) (citations and quotation marks omitted). However, "[t]he mere fact that adverse parties contend for different constructions does not of itself force the conclusion that the disputed language is ambiguous." <u>Antram v. Stuyvesant Life Ins. Co.</u>, 287 So. 2d 837, 840 (Ala. 1973). "The terms of an insurance policy are ambiguous only if the policy's provisions are reasonably susceptible to two or more constructions or there is reasonable doubt or confusion as to their meaning." <u>State Farm</u>, 747 So. 2d at 308-09; <u>see also</u> <u>Twin City Fire Ins. Co. v. Alfa Mut. Ins. Co.</u>, 817 So. 2d 687, 695 (Ala. 2001) ("an ambiguity arises when more than one interpretation may fairly be given to a policy provision").

### 2.   *Nature of All-Risk Policy*

In support of its contention that the Policy does not cover C&G for the damage to Hull 117's engines, Underwriters remind the Court that an all-risk policy does not insure against all losses. (Doc. 27-1 at 13; Doc. 30 at 8). Underwriters also direct the Court to a leading treatise's

observation that "'All-Risk' policies only insure against a loss that arises from a fortuitous event that is unexpected and not probable."  See Doc. 27-1 at 13 (quoting 7 Steven Plitt et al., Couch on Insurance § 101:7 (3d ed. 1997 & Supp. 2006)).  According to Underwriters, the fortuity-of-loss requirement is satisfied only where the causative event is "beyond the control of the insured," and, therefore, C&G's loss was not fortuitous because it was the result of an intentional act, namely a C&G employee's deviation from Cook and Elmore's oral instructions.  See Doc. 38 at 2-5.  The Court rejects both the premise that an insured's actions cannot give rise to a fortuitous loss as well as Underwriters' characterization of stick welding and torch cutting on Hull 117 as intentional misconduct by C&G.

Though Alabama cases involving all-risk insurance policies are few and far between, the Court of Civil Appeals has acknowledged that such a policy is "very broad in its coverage."  See State Dep't of Ins. v. Arthur J. Gallagher & Co., 622 So. 2d 370, 372 (Ala. Civ. App. 1993). More helpfully, the Eleventh Circuit has outlined a number of basic principles applicable to all-risk policies:

> An "all risk" policy . . . typically works in favor of the insured: once the insured establishes a loss apparently within the terms of an "all risks" policy, the burden shifts to the insurer to prove that the loss arose from a cause which is excepted. This benefit to the insured applies, however, only where what is at issue is the risk insured against in an all-risk policy.
>
> In contrast, an insurance policy may provide coverage for "named perils," where, for example, the insured may purchase protection from a specific peril, such as fire, collision, or ice.  In these cases, the insured may recover only if the loss was caused by one of the covered perils enumerated in the policy.
>
> Cases involving an "all risk" insurance policy generally share a common theme: a determination of whether the claimed loss or damage was caused by a peril falling within the policy's coverage.  This point is further illustrated by Webster's definition of the word "risk:" "someone or something that creates or suggests a hazard or adverse chance" or "the chance of loss or the perils to the subject matter of insurance covered by a contract."

Fireman's Fund Ins. Co. v. Tropical Shipping & Constr. Co., 254 F.3d 987, 1006-07 (11th Cir.

2001) (internal citations, quotation marks, and brackets omitted).

As Underwriters' favored treatise notes, with respect to an all-risk policy, an insured need not prove the cause of its claimed loss:

> The purpose of an "All-Risk" policy is to insure losses when the cause of the loss is unknown or the specific risk was not explicitly contemplated by either party. This purpose is, in part, accomplished by a mechanism of burden-shifting as to which party bears the risk of an unexplained or uncontemplated loss. In an "All-Risk" policy, the insured has the initial burden to prove that the loss occurred. The burden then shifts to the insurer to prove that the cause of the loss is excluded by the policy.

7 Plitt et al., *supra*, § 101:7.  Similarly, the old Fifth Circuit has held that it is "inconsistent with the broad protective purposes of 'all risks' insurance to impose on the insured . . . the burden of proving the precise cause of the loss or damage."    Morrison Grain Co. v. Utica Mut. Ins. Co., 632 F.2d 424, 430 (5th Cir. 1980).  However, the insured does bear the burden of demonstrating fortuity — a burden that "is not a particularly onerous one."  Id.

More than half a century ago, the Alabama Supreme Court held that the term "accident" does not exclude injuries caused by human negligence.  See Emp'rs Ins. Co. of Ala. v. Rives, 87 So. 2d 653, 655 (Ala. 1955).  Subsequently, many courts have held that, absent some exclusion or exception, all-risk insurance policies cover losses attributable to the insured's own negligence. See, e.g., Ingersoll Milling Mach. Co. v. M/V Bodena, 829 F.2d 293, 307 (2d Cir. 1987) ("All risk coverage covers all losses which are fortuitious [sic] no matter what caused the loss, including the insured's negligence, unless the insured expressly advises otherwise."); Morrison Grain, 632 F.2d at 431 ("a loss may be fortuitous even it if is occasioned by the negligence of the insured"); Goodman v. Fireman's Fund Ins. Co., 600 F.2d 1040, 1042 (4th Cir. 1979) ("[L]oss due to the negligence of the insured or his agents has generally been held to be fortuitous and, absent express exclusion, is covered by an all risks policy."); C. H. Leavell & Co. v. Fireman's Fund Ins. Co., 372 F.2d 784, 787 (9th Cir. 1967) ("Negligence on the part of the insured or his

employees is no defense against his recovery for the loss he has suffered."); <u>Redna Marine Corp.</u> <u>v. Poland</u>, 46 F.R.D. 81, 87 (S.D.N.Y. 1969) ("It is well established that where negligence, even on the part of the employees of the insured, causes a loss, that loss is fortuitous and within the coverage of all risks insurance."). This conclusion is further supported by noted insurance and tort law commentators. <u>See, e.g.</u>, 10A Lee R. Russ & Thomas F. Segalla, <u>Couch on Insurance</u> § 148:66 (3d ed. 1997 & Supp. 1998) ("Negligence on the part of the insured or his or her employees is no defense in an action against an all-risks insurer for a loss the insured suffers, as negligence does not prevent the loss from being fortuitous."); Stephen A. Cozen & Richard C. Bennett, <u>Fortuity: The Unnamed Exclusion</u>, 20 Forum 222, 246 (1985) ("Loss caused by common or garden variety negligence is clearly fortuitous in nature . . . .").

In its reply brief, Underwriters alleged for the first time that torch cutting the pipe used to make Hull 117's lube oil piping systems was an intentional, rather than negligent, act. However, this assertion lacks adequate support from the record. After six months of discovery, neither Underwriters nor C&G can identify the employee(s) responsible for using stick welding and burning torch techniques on Hull 117. To support their allegation of intentional misconduct, Underwriters point only to Cook's characterization of stick welding and torch cutting as breaches in protocol that the offending employee would have known "he shouldn't do." <u>See</u> Doc. 38 at 4-5 (citing Doc. 27-6 at 3 & Doc. 38-1 at 6). Absent from the record is any evidence of the employee's state of mind, which is crucial to determining whether his actions were, in fact, intentional. <u>See</u> <u>Ex parte Capstone Bldg. Corp.</u>, __ So. 3d __, 2012 WL 887497, at *17 (Ala. Mar. 16, 2012) (Murdock, J., specially concurring) (quoting W. Page Keeton et al., <u>Prosser and</u> <u>Keeton on the Law of Torts</u> § 8 (5th ed. 1984) ("The three most basic elements of the most common usage of 'intent' are that (1) it is a *state of mind*, (2) about *consequences* of an act (or

omission) and not about the act itself, and (3) it extends not only to having in the mind a *purpose* (or *desire*) to bring about given *consequences* but also having in mind a belief (or knowledge) that given consequences are *substantially certain* to result from the act.")).  Though Underwriters conflate *volitional* acts with *intentional* acts, Alabama law distinguishes the two.  See, e.g., U.S. Fid. & Guar. Co. v. Armstrong, 479 So. 2d 1164, 1166-67 (Ala. 1985) (discharge of raw sewage resulting from contractor's deliberate crushing of sewer line was accidental where contractor did not specifically intend for sewage to back up in the line and flow onto adjacent private property). Additionally, Alabama law acknowledges that an employer is not liable where, as here, he instructs his employees to undertake certain measures to prevent damage but damage results from the employees' subsequent and negligent failure to follow those instructions.  See Moss v. Champion Ins. Co., 442 So. 2d 26, 29 (Ala. 1983) (water damage to plaintiff's property was accidental where contractor's employees failed to follow instructions designed to prevent, not cause, damage).

Whereas the damage to Hull 117's engines is undisputed, and whereas the record cannot support the conclusion that said damage was caused by intentional misconduct, C&G has demonstrated that a fortuitous loss occurred, and the burden shifts to Underwriters to prove that an exclusion expressed in the Policy precludes coverage.

### 3.  Applicability of Faulty Procedures Exclusion

In declining to cover C&G for the damage done to Hull 117's engines, Underwriters relied specifically on the Policy's faulty procedures exclusion, which, as both parties acknowledge, no court has interpreted.  (Doc. 28-1 at 23; Doc. 30 at 13 n.3).  In its entirety, the exclusion states that "Underwriters shall not pay for any loss, damage or expense caused or arising in consequence of [f]aulty production or assembly procedures even if constituting faulty

design." (Doc. 27-7 at 2). The Policy takes care to define more than a dozen words ranging from "Assured" to "Vessel" and from "Fungus" to "Sabotage," <u>see</u> Doc. 1-7, but nowhere does it define "procedures." Nonetheless, this case turns on that word, and, unsurprisingly, the parties disagree as to its meaning. Essentially, C&G maintains that "procedures" means "pre-build instructions" (Doc. 33 at 27), whereas Underwriters argue that the word also encompasses the acts actually performed by a builder's employees. <u>See</u> Doc. 30 at 9 (rejecting C&G's "position that only its instructions for construction and flushing of the system, rather than how its employees actually constructed it, is determinative or whether the exclusion applies"); <u>id.</u> at 10 (arguing that the exclusion is triggered "when an insured incorrectly plans or incorrectly executes the production or assembly of a vessel").

"[W]here questions arise as to the meaning of an undefined word or phrase, the court should simply give the undefined word or phrase the same meaning that a person of ordinary intelligence would give it." <u>Twin City</u>, 817 So. 2d at 692 (citation omitted). To find that meaning with respect to "procedure," Underwriters have turned to the internet, favoring one of six definitions available at merriam-webster.com: "a particular way of accomplishing something or of acting." <u>See</u> Doc. 30 at 9 (citing http://merriam-webster.com/dictionary/procedure). Other dictionaries define the word somewhat differently.[6] But these resources are of little assistance here, insofar as "a manner of proceeding," "a way of acting," and "a particular way of going

---

6   <u>See, e.g.</u>, <u>American Heritage Dictionary of the English Language</u> 1404 (5th ed. 2011) ("A manner of proceeding; a way of performing or effecting something"); <u>id.</u> ("A series of steps taken to accomplish an end"; <u>id.</u> ("A set of established forms or methods for conducting the affairs of an organized body such as a business, club, or government"); <u>Webster's Third New International Dictionary of the English Language, Unabridged</u> 1807 (2002) ("a particular way of doing or of going about the accomplishment of something"); <u>id.</u> ("a traditional, customary, or otherwise established or accepted way of doing things"). One highly regarded dictionary defines "procedure" as "[a] set of instructions for performing a specific task," but, for reasons unclear, it limits that definition to the context of computers. 12 <u>Oxford English Dictionary</u> 543 (2d ed. 1989).

about the accomplishment of something" are as equally susceptible to multiple constructions as is "procedure." Each phrase could reasonably be understood to mean either that which is *to be* done or that which *has been* done. Accordingly, though the Court is mindful that "[a]n undefined word or phrase in an insurance policy does not create an inherent ambiguity," Twin City, 817 So. 2d at 692, the Court finds that "faulty production or assembly procedures" is ambiguous in the context of the Policy because it is unclear whether a person of ordinary intelligence applying for insurance would have understood "procedures" to refer to acts actually executed in addition to instructions to be followed and steps to be taken.

In Alabama, a court that finds a contract to be ambiguous must employ established rules of contract construction to resolve the ambiguity. Voyager Life Ins. Co. v. Whitson, 703 So. 2d 944, 948 (Ala. 1997). One such rule is that the court must consider an insurance policy as a whole rather than parse language in isolation. See State Farm, 747 So. 2d at 309 (citation omitted). Another, as noted above, is that exclusions to coverage are to be interpreted as narrowly as possible and construed most strongly against the insurance company, which drafted and issued the policy. See Allstate, 675 So. 2d at 379-80.

Underwriters' preferred reading of "faulty production or assembly procedures" violates both principles. First, as C&G notes, such an expansive understanding effectively equates "procedures" with "workmanship," thereby eviscerating the coverage in Addendum No. 2, ¶ 1.a (discussed in greater detail below) for destruction, deformation, breaking, tearing, bursting, holing or cracking of the Vessel that arises in consequence of faulty workmanship or the installation or use of improper or defective materials. See Doc. 27-7 at 2.[7]   Second,

_____

[7]   Senior Marine Claims Representative Marshall's deposition testimony demonstrates how Underwriters' reading likens "faulty procedure" to "faulty workmanship":

Underwriters' construction is broader than C&G's and, therefore, is obviously not "as narrow[]
as possible."  Accordingly, the Court construes "faulty production or assembly procedures" to
mean only faulty production and assembly instructions.

Underwriters bear the burden of proving that, with respect to Hull 117's lube oil piping
systems, C&G's production and assembly instructions were faulty.  Acceptance Ins. Co. v.
Brown, 832 So. 2d at 1, 12 (Ala. 2001) ("In general, the insurer bears the burden of proving the
applicability of any policy exclusion.").  Towards this end, Underwriters' advance several
unpersuasive arguments, three of which can be addressed summarily, and one of which requires
some additional attention.

First, Underwriters argue that C&G did not provide its employees with written
instructions as to the welding and cutting of pipe.  (Doc. 27-1 at 17).  However, Underwriters fail
to cite any authority for the proposition that instructions conveyed orally are either improper *per
se* or not really instructions at all.  Underwriters then argue that C&G did not provide any

---

Q  If you have a procedure and it's followed and injury or damage occurs, are
we speaking about a faulty procedure or are we speaking about workmanship?
A  Workmanship would be the actual steps taken, the work done, but that's
also a procedure that was implemented.  If they had a protocol in place which they
did not follow, that is also a procedure.  The exclusion does not limit it to one or
the other.
Q  So if you have a procedure and the procedure is a proper procedure --
assume hypothetically that it's a proper procedure in all respects -- and that
procedure is not followed and damage results, are we speaking of faulty
production procedures or are we speaking of faulty workmanship?
A  If, as you say, hypothetically speaking, there was a correct protocol that
was not followed but the implementation of that protocol was faulty, that's a
faulty procedure.  The implementation, the work, the steps taken, that is a faulty
procedure.
Q  So that's not -- that's not faulty workmanship then?
A  It would be faulty workmanship for the purposes of exclusion I(a), but for
the purposes of production procedures, it would be the steps taken or work done
that was faulty.

(Doc. 28-11 at 16-17 (emphasis added)).

instructions, oral or otherwise, to its employees regarding the assembly or flushing of the lube oil systems. (Id.). This assertion is not supported by any evidence, but rather is belied by the declarations of Cook, Elmore, and three C&G employees, each of which attests to discussions concerning the manner in which the lube oil piping systems were to be flushed following installation.[8] Next, Underwriters claim that Cook's instructions were insufficient because they did not address whether torch cutting was permitted on Hull 117. (Id. at 17-18). However, as noted above in Section IV.A.1 of this Order, Cook explained that his instruction to deburr and clean all cuts prior to fit up necessarily implied that the pipe was to be penetrated using cold cutting and drilling techniques rather than a burning torch. (Doc. 33-3 at 2, ¶ II). Underwriters have not rebutted this evidence.

In their fourth and final argument, Underwriters assign significance to the fact that C&G's procedures did not call for the use of "tappers," pneumatic hammers that promote vibration during the flushing process. (Doc. 27-1 at 11; Doc. 30 at 10-11; Doc. 38 at 7-9). In their opening brief, Underwriters asserted as an undisputed fact that tappers "create a vibration that shake the excess metal inside the pipe loose so that it can be properly flushed" (Doc. 27-1 at 11), but it is far from undisputed that a flushing procedure that excludes that use of tappers is improper *per se*. In reply, Underwriters endeavored to support their claim, attaching as an exhibit ASTM Standard D4174-89, entitled "Standard Practice for Cleaning, Flushing, and

---

[8]   See Doc. 33-3 at 4, ¶ X ("Declarant advised William 'Billy' Elmore of the . . . cleaning procedures to be used. . . . Declarant discussed with William Elmore the fitting and welding of the piping, including the methods used for . . . cleaning and flushing the piping."); Doc. 33-4 at 4-5, ¶¶ XIII & XVI ("As respects the lube oil piping system for Hull No. 117, William Cook advised Declarant of the . . . cleaning procedures to be used. . . . Declarant discussed with William Cook the fitting and welding of the piping, including the methods used for . . . cleaning and flushing the piping. . . . Declarant relayed to and discussed those instructions with Kenneth Sprouse, the pipe foreman on Hull No. 117."); Doc. 8-2 at 12, ¶ XIII ("Declarant was repeatedly advised by Kenneth Sprouse and other C & G personnel of the above procedure . . . ."); id. at 19, ¶ XIII (similar); id. at 26, ¶ XIII (similar).

Purification of Petroleum Fluid Hydraulic Systems," which advises how to flush a piping system. (Doc. 38-2). First, Underwriters have belatedly introduced a new issue to which C&G has no opportunity to respond. See Murphy v. Vill. of Hoffman Estates, No. 95 C 5192, 1999 WL 160305, at *2 (N.D. Ill. Mar. 17, 1999) ("Providing specifics in a reply in support of a general argument . . . counts as new matter in reply."). Second, Underwriters have offered the ASTM standard without any context or explanation as to its relevance. Underwriters merely posit, without support from any expert or learned authority that could explain the relevance of the ASTM standard, that vibrating the pipe is "a critical step" in the cleaning process and that "C&G's procedures were faulty because it could not remove any weld spatter or torch slag without a vibration technique." (Doc. 38 at 9). But even on its face, the ASTM standard does not support that conclusion. With respect to vibration, the ASTM document merely notes 1) vibration is one of several factors, including oil temperature level, oil temperature cycling, and oil velocity, that "*contribute to* the success of an oil flush"; and 2) "[l]oosening of solids *will be promoted by* hammering or vibration." (Doc. 38-2 at 7, ¶¶ 9.1.3 & 9.1.4 (emphasis added)). Through Cook, C&G has conceded that vibration can "*facilitate* the cleaning process" (Doc. 27-6 at 3 (emphasis added)), but Underwriters have failed to show that any procedure that omits the use of tappers is, by virtue of that omission, ineffective or improper. Accordingly, Underwriters have not proved, as they must, that C&G's production and assembly procedures were faulty.

### 4. *Applicability of Faulty Workmanship Exclusion*

Though Paragraph 1.a of Addendum No. 2, which excludes coverage for loss, damage, and expense caused by faulty workmanship (the "faulty workmanship exclusion"), was not the basis upon which Underwriters denied C&G's claim, see Docs. 28-7 & 28-10, C&G derives importance from that exclusion nonetheless, inasmuch as it contains a limited exception for

24

faulty workmanship "resulting in destruction, deformation, breaking, tearing, bursting, holing or cracking of the Vessel." See Doc. 28-1 at 17-18.  Underwriters respond to C&G's argument in a single paragraph, contending that the exception applies only to hull damage rather than damage to other parts of the ship.  (Doc. 30 at 13).  The Court cannot countenance Underwriters' reading. "Vessel" is term defined by the Policy, and the Policy's definition expressly incorporates much more than the hull.  Specifically, it includes, *in addition to the hull*, "launches, lifeboats, rafts, furniture, bunkers, stores, tackle, fittings, equipment, apparatus, machinery, boilers, refrigeration machinery, insulation, motor generators, and other electrical machinery, ordnance, munitions, and appurtenances, including materials, plans, patterns and moulds, staging, scaffolding and similar temporary construction."  (Doc. 1-7 at 6).  "Where an insurance policy defines certain words or phrases, a court must defer to the definition provided by the policy."  Twin City, 817 So. 2d at 692 (citing St. Paul Fire & Marine Ins. Co. v. Edge Mem'l Hosp., 584 So. 2d 1316 (Ala. 1991)).  Whereas Hull 117's main engines could reasonably be considered "equipment," "machinery," or "other electrical machinery" that was destroyed or broken by C&G's faulty workmanship, the Court finds that Underwriters have not proven that the faulty workmanship exclusion bars coverage.  To the contrary, the exception to that exclusion allows coverage under the Policy.[9]

---

[9]   An exception to an exclusion merely reinstates coverage.  "It is the initial broad grant of coverage, not the exception to the exclusion, that ultimately creates (or does not create) the coverage sought."  David Dekker et al., The Expansion of Insurance Coverage for Defective Construction, 28 Constr. Law. 19, 20 (2008).  Accordingly, notwithstanding C&G's argument that the faulty workmanship exclusion sets forth a "broad grant of coverage" (Doc. 28-1 at 17), the question for the Court is whether the all-risks policy at issue here covers C&G's faulty workmanship, absent a contrary exclusion.  Put differently, the issue is whether faulty workmanship is a fortuitous event.  For the reasons expressed in Section IV.B.2, *supra*, the Court finds that it is.  See also Town & Country Prop., L.L.C. v. Amerisure Ins. Co., __ So. 3d __, 2011 WL 5009777, at *5 (Ala. Oct. 21, 2011) (holding that "faulty workmanship itself" is not an

V.      **Conclusion**

In accordance with the foregoing, it is **ORDERED** that Defendant's Motion for Summary Judgment (Doc. 28) is **GRANTED** and that each of Plaintiffs' motions (Docs. 27, 31, 32, & 39) is **DENIED**.

As provided in Rule 58 of the Federal Rules of Civil Procedure, Judgment shall be entered by separate document.

**DONE** and **ORDERED** this the **15th** day of **May 2012**.

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**

---

accident covered by a commercial general liability policy but that faulty workmanship "may lead to" a covered event if other damage results).